## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| ZENOBIA MONDAINE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **CIVIL ACTION** |
| v. | ) | |
| | ) | **No. 04-2351-KHV** |
| AMERICAN DRUG STORES, INC. | ) | |
| d/b/a OSCO'S DRUG STORE #5161, and | ) | |
| DAMON SHILHANEK, | ) | |
| | ) | |
| Defendants. | ) | |

_____)

## MEMORANDUM AND ORDER AND ORDER TO SHOW CAUSE

Zenobia Mondaine filed suit against her former employer American Drug Stores, Inc. d/b/a Osco's Drug Store #5161 ("Osco") and her former supervisor at Osco, Damon Shilhanek.  Plaintiff asserts claims for retaliation under 42 U.S.C. § 1981, the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Family And Medical Leave Act, 29 U.S.C. § 2611 *et seq.* ("FMLA"), and the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA").  Plaintiff also asserts claims for substantive violations of the FMLA and ADA.  This matter is before the Court on Defendants' Motion For Summary Judgment (Doc. #63) filed September 2, 2005.  For reasons stated below, defendant's motion is sustained in part.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  See Fed. R. Civ. P. 56(c); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th

Cir. 1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence. Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, 942 F.2d 737, 743 (10th Cir. 1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. Applied Genetics, 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment." Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. Anderson, 477 U.S. at 250-51. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

**Factual Background**

The following facts are uncontroverted, deemed admitted or, where disputed, viewed in the light most favorable to plaintiff, the non-movant.[1]

Zenobia Mondaine is a 46-year old African-American female. On November 5, 2001, plaintiff began working for Osco as a scan coordinator at Osco Store 5161 in Leawood, Kansas. Plaintiff was required to work at least 28 hours a week to retain her benefits through Osco. Plaintiff worked 40 hours and as many as 42 hours a week. As scan coordinator, plaintiff changed merchandise prices, inserted new merchandise items on store shelves, and conducted audits to determine whether the prices displayed on merchandise matched the prices shown on the computer system. Plaintiff also performed general clerk duties such as customer service, general housekeeping and stocking.

---

[1]      Plaintiff attempts to controvert many of defendants' factual statements by arguing that they are incomplete or mischaracterize the record. She does not explain, however, what part of defendant's statements she controverts. For example, defendants' statement of fact paragraph 78 states as follows:

> Mondaine admits that she received Osco's Associate Handbook, which contains a section regarding FMLA leave. In addition, Osco posted the FMLA rights in the employee break room.

In response, plaintiff states as follows:

> CONTROVERTED.   Osco, again, grossly mischaracterizes the numerous FMLA violation[s] and retaliatory acts committed by Osco. It is Osco's gross mischaracterization and contortion of the evidence that required Plaintiff's, court appointed counsel to prepare an additional Statement of Fact Section with over 200 additional facts that Osco has ignored.   See, Plaintiff's Statement Of Facts ¶¶ 17-162 & 168-193, which are incorporated by reference herein.

Plaintiff's response to defendant's statement of facts ¶ 78; see also plaintiff's response to defendants' statement of facts ¶¶ 59-65, 69-70, 72-73, 79-80, 83.

Plaintiff's attempt to controvert facts in this manner is insufficient under D. Kan. Rule 56.1, which provides that all material facts set forth in the statement of the movant shall be deemed admitted unless "specifically controverted" by the opposing party. Therefore, many of defendants' statement of facts are deemed admitted.

Shortly after plaintiff started at Osco, she advised Damon Shilhanek, market manager for the Kansas City area and general manager of Store 5161, that she wanted to work days because she had glaucoma.[2]  Plaintiff worked as the scan coordinator for Store 5161 from November 5, 2001 through mid-January of 2003.

On October 7, 2002, Shilhanek gave plaintiff a Corrective Action Associate Review ("CAAR") for excessive tardiness.  Shilhanek noted that in the month of September alone, plaintiff had arrived to work late 14 times and from April to September of 2002, she had arrived to work late 79 times.  Plaintiff signed the CAAR and did not note anything in the section titled "Associate Explanation and/or Response Concerning Current Review."  In her deposition, plaintiff testified that she did not think that the numbers in the CAAR were correct, but that she did not know.  Plaintiff told Shilhanek that if she had a business and he had been absent that many times, she would let him go.

On October 7, 2002, Shilhanek also gave plaintiff a CAAR for insubordination.  Shilhanek noted that the CAAR was for three separate incidents:

- on September 30, plaintiff argued with Shilhanek and Bob Tuck (another manager) about making signs, saying that it wasn't her job;

- on October 6, plaintiff refused to follow a work order given to her by Terina Endecott; and

- on October 6, plaintiff changed her work schedule without management approval.

---

[2]      Plaintiff's glaucoma prevented her from seeing small things and caused her to suffer headaches.  Additionally, plaintiff had trouble seeing at night and experienced blurred vision.  Early in plaintiff's employment, Osco managers knew that plaintiff had glaucoma.  During her initial job interview, plaintiff told Shilhanek that she had glaucoma and was going to need eye surgery.  Shilhanek, who made the decision to hire plaintiff, said that it "wouldn't be a problem."  Plaintiff did not ask Osco to modify her job because of her glaucoma.

Plaintiff noted on the CAAR that she did not refuse to follow a work order and that Endecott was harassing her.  Plaintiff refused to sign the CAAR.

Osco periodically audited plaintiff's performance as scan coordinator.  When plaintiff started the job, Shilhanek explained that she needed to pass audits to keep her job.  On December 12, 2002, plaintiff scored 89 on an audit, below the district standard of 95.[3]  Shortly thereafter, plaintiff told Shilhanek that because of a lack of cooperation from other employees and because her feet had been hurting, she wanted to work 32 hours per week.  Because plaintiff was unable to perform the functions of scan coordinator in 32 hours per week, Shilhanek assigned her to a clerk position.

On January 17, 2003, Osco hired Inna Verzhbytska and plaintiff began performing only general clerk functions.  Scan coordinators are paid on a higher wage scale than clerks, but Shilhanek allowed plaintiff to retain her scan coordinator salary.  As a clerk, plaintiff's duties included cleaning, stocking, serving as a cashier, doing other odds and ends and "fronting and facing."[4]

In April of 2003, plaintiff had a medical condition which prevented her from lifting more than 25 pounds.  On April 22, 2003, John Svoboda, a supervisor at Store 5161, asked plaintiff to assist a customer who had purchased a patio umbrella which weighed more than 25 pounds.  Svoboda loaded the umbrella on a dolly, but it fell off and hit plaintiff in the stomach.  Plaintiff told Svoboda that she could not take the umbrella because it was too heavy, but Svoboda insisted.  Plaintiff tore her rotator cuff while trying

---

[3]     Osco did not have a formal "pass" or "fail" score, but it had a district guideline standard of 95.

[4]     Fronting and facing is inspecting store shelves and placing merchandise on the front of the shelf, facing forward.

to wheel the umbrella to the customer's car.  Because of her injuries, plaintiff missed work from April 22

to 24, 2003.  Svoboda completed a workers' compensation form regarding the incident.  Osco's Benefits

Department informed Shilhanek that plaintiff was not eligible for worker's compensation because she did

not miss enough work.

Shortly after plaintiff returned to work, she developed severe foot problems.  On one occasion

between April 25 and July 13, 2003, plaintiff told Shilhanek about her foot problems and asked him about

FMLA leave.  Under Osco's policy, an oral request is sufficient to trigger the FMLA leave procedure.

Shilhanek, however, simply told plaintiff that she did not qualify.[5]  Plaintiff informed Shilhanek that she might

file a worker's compensation claim in connection with her foot problems.  Shilhanek asked plaintiff two or

three times if she really wanted to do that and told her she would regret it.[6]  Shilhanek later reprimanded

plaintiff for moving too slow.

From February through June of 2003, plaintiff worked 28 to 32 hours per week as a clerk.  On

July 13, 2003, a non-work day, plaintiff was involved in a car accident.  On September 30, 2003, plaintiff

had foot surgery.  From July 14 through November 26, 2003, plaintiff was absent from work on paid

disability leave.

_____

[5]       The record does not reflect that plaintiff was in fact qualified to receive FMLA leave.  The
employee handbook which plaintiff received and the poster in the break room of Store 5161 notified
employees of their FMLA rights.  Plaintiff was also aware of her FMLA rights based on her education, her
experience with prior employers, and the fact that other Osco employees had taken FMLA leave and
returned to their jobs.

[6]       Shilhanek also told plaintiff something about the order in which she would receive worker's
compensation benefits in relation to unemployment benefits.  See Plaintiff's Depo. at 143 (Shilhanek said
plaintiff would receive unemployment benefits first and then worker's compensation); id. at 293 (Shilhanek
said plaintiff would receive worker's compensation benefits first, then unemployment benefits).

Plaintiff submitted a worker's compensation claim relating to the injuries which she sustained in the car accident and while trying to move the patio umbrella.[7]  Osco maintained an absence calendar for 2003 which indicates that from July 15 through the end of 2003, plaintiff was off work due to an injury.  The absence calendar form states:

> Please use this log to track any reason for tardiness or absence.  Include the date of the absence, the reason, and whether the time qualifies for FMLA status.  If an absence qualifies for FMLA status, you must notify the associate that date(s) will count toward their FMLA leave and make sure the appropriate documentation is on file.  For FMLA leaves, indicate one of the following reasons: (1) adoption or foster care of a child; (2) serious health condition of a child, parent or spouse; (3) serious health condition of associate; (4) birth or newborn care of associate's child.

Osco keeps FMLA request forms at each individual store.[8]

On November 26, 2003, Dr. John Gamble, Jr. prepared a typewritten note releasing plaintiff to return to work on November 28, 2003 "LIMITED TO 4 HRS DAILY."  Dr. Gamble's secretary altered the note to read "LIMITED TO *2 TO* 4 HRS DAILY" because the secretary believed that Dr. Gamble had no idea how long it would take for plaintiff's foot to heal or what kind of problem plaintiff had. Although Dr. Gamble released plaintiff to return to work on November 28, 2003, plaintiff did not return

---

[7]     Neither party explains why plaintiff filed a worker's compensation claim related to the car accident which occurred on a non-work day.

Plaintiff's statement of fact paragraph 25 states that Shilhanek did not want more worker's compensation claims because the charges in connection with a claim are multiplied by a risk factor and then charged back to the store where the claim originated.  Defendants object to the fact as unsupported by the record.  Because plaintiff did not attach a copy of the pertinent deposition transcript, the Court disregards this evidence.

[8]     Shilhanek did not know if his store had FMLA request forms or what "appropriate documentation" is required for FMLA leave.  Shilhanek has never had any training regarding FMLA leave and he has never contacted anyone to ask whether he or other managers should determine when an associate requested FMLA leave.

to work immediately because she had not seen an orthopedic doctor.  On or about December 4, 2003, plaintiff submitted the note from Dr. Gamble's office to Warren Koch, who had become general manager of Store 5161 in early November of 2003.[9]  Koch later prepared a memorandum (dated December 12, 2003) which stated that the entire doctor's note was typed except for the "2 to" which was handwritten. Shilhanek received a copy of Dr. Gamble's note and faxed it to Dana Bauer, Osco's HR Director, along with a copy of the original note which Dr. Gamble's office faxed to him.  Shilhanek told Bauer that the certificate had possibly been falsified, but Bauer said that there was no proof that the certificate was falsified.  Bauer told Shilhanek to contact plaintiff's doctor and obtain a copy of the original return-to-work certificate.

Shilhanek sought advice from Bauer regarding plaintiff's return to work.  Bauer advised Shilhanek that because plaintiff had been off work for more than four months and the financial condition of Store 5161 had deteriorated, Shilhanek could offer plaintiff whatever hours, if any, Store 5161 had available within her medical restrictions.[10]

Because of budgetary constraints and Shilhanek's perception that plaintiff could not run the photo lab, Shilhanek and Koch determined that they could not add plaintiff to the day shift.[11]  On December 12,

---

[9]      From November of 2003 through October of 2004, Shilhanek and Koch co-managed Store 5161.  Shilhanek also retained his market manager position.

[10]      Store 5161 was not meeting its budget and management had been directed to cut employee hours.

[11]      Plaintiff was able to run the one hour photo machine, but Shilhanek did not believe that she could run the photo lab in an "efficient or competent manner."  Declaration Of Damon Shilhanek ¶ 6, Exhibit D to Defendants' Memorandum (Doc. #64).  Shilhanek had attempted to train plaintiff in the photo lab in January of 2003.  According to Shilhanek, plaintiff did not understand how to use the photo machine
(continued...)

2003, Shilhanek, Koch and Preet Rana (a supervisor) met with plaintiff to discuss her return to work. Shilhanek told plaintiff that because of payroll constraints, Store 5161 only had evening and weekend hours available.  Plaintiff responded that she could not work evenings because her glaucoma made it difficult to drive at night.  Shilhanek asked plaintiff to get back to them on her availability.  Shilhanek then asked plaintiff about the return-to-work certificate and specifically about the change from "4 hrs daily" to "2 to 4 hours daily."  Plaintiff suggested calling Dr. Gamble's office while everyone was present, but Shilhanek told plaintiff that she could not use the phone.  Plaintiff left the meeting and that same day, filed a charge with the Equal Employment Opportunity Commission ("EEOC").  Plaintiff alleged that because of her race, age and disability, (1) Osco management did not give her help in her job as scan coordinator, (2) Osco management wrote her up when she complained and gave her scan coordinator job to someone else and (3) she was injured on the job when she was working as a clerk.  Plaintiff also noted that Osco wanted her to work night shifts but that she could not see at night.[12]  Osco did nothing to schedule plaintiff during the day and it did not ask other employees to change shifts to accommodate plaintiff.

On December 12, 2003, shortly after the meeting with plaintiff, Shilhanek and Koch called Dr. Gamble's office.  Bauer instructed Shilhanek and Koch to call the doctor's office on one occasion, but she does not recall when she gave that instruction.  Bauer testified that she would not instruct an Osco manager to prohibit an employee from being included in a phone conversation with that employee's doctor's office and that it would be unusual if Shilhanek and Koch had instructed plaintiff to leave the room so that they

---

[11](...continued)
and would just throw up her hands and say "I can't do this."  Id.; see Shilhanek Depo. at 185.

[12]      In her EEOC charge, plaintiff also alleged retaliation but she did not specify any protected activity or retaliatory acts by Shilhanek.

could contact her doctor's office.  Osco did not ask plaintiff's permission to contact her doctor.

On February 26, 2004, Dr. Gamble gave plaintiff an amended return-to-work certificate which indicated that she could work 32 hours per week.  On March 12, 2004, plaintiff settled her worker's compensation claim for $2,500.  Shilhanek knew of the settlement.  Plaintiff did not return to work until March 17, 2004, because she was sick and had foot and shoulder problems.[13]

––––––––––––––––––––

[13]     In a declaration, Nick Dalitto, the benefits administration manager of Osco, stated that under Osco policies, plaintiff was off work on unapproved leave from November 27, 2003 through February 26, 2004 and that Osco could have terminated her employment during that period.  See Declaration Of Nick Dalitto ¶ 5, Exhibit MM to Defendants' Memorandum (Doc. #64).  In addition, Dalitto stated that under Osco policies, plaintiff's absence between February 27 and March 16, 2004 was unauthorized and that Osco could have terminated her employment during that period as well.  See id. ¶ 8.  Plaintiff argues that these statements attempt to create a sham issue because Dalitto previously admitted that Osco was reviewing plaintiff's claim for disability during these same periods and did not notify plaintiff that it was denying her claim until April 15, 2004.

The Court will disregard affidavits which are inconsistent with prior sworn testimony if the changes attempt to create a sham fact issue.  See Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986).  The utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting an affidavit contradicting his own prior testimony.  Id.  To determine if an affidavit is an attempt to create a sham issue of fact, the Court must consider "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain."  Id.

The fact that defendant had the right to terminate plaintiff's employment under Osco policies does not directly contradict Dalitto's deposition testimony that Osco was reviewing plaintiff's claim of disability during her leave periods.  In addition, Dalitto's statements are largely immaterial because Osco did not actually terminate plaintiff while she was on leave.  Osco apparently includes the statements to show that it did plaintiff a favor by not terminating her employment between November 27, 2003 and March 17, 2004 – a fact which is not directly relevant to whether Osco subsequently violated plaintiff's rights.  The Court therefore declines to strike Dalitto's declaration on these subjects.

Even so, the Court excludes defendant's statements on these issues for other reasons.  D. Kan. Rule 56.1(d) provides that where facts referred to in a declaration are contained in another document, a copy of the relevant excerpt from the document shall be attached.  Defendant has not attached a copy of the policy which would permit it to terminate an employee on leave who has a pending claim for paid disability.  In addition, defendant did not advise plaintiff until April 15, 2004 that she did not qualify for disability after November 26, 2003 or that her FMLA leave ended on February 26, 2004.  See Exhibit 7

(continued...)

- 10 -

When plaintiff returned to work, she performed general clerk functions but continued to receive the higher scan coordinator salary.  When plaintiff returned to work, the store lay-out had changed and she was never trained on the new lay-out.[14]

When plaintiff returned to work on March 17, 2004, Koch understood that she had a medical restriction and could work no longer than two to four hours per day.  Because of budgetary constraints and management's perception that plaintiff could not run the photo lab, Koch and Henry determined that the only work hours available to plaintiff were three hours on Wednesday nights, three hours on Thursday nights, and three hours on Saturday mornings.[15]  Shortly after March 17, however, Koch received the amended return-to-work certificate which indicated that plaintiff could work 32 hours per week.[16]  Bauer

_____

[13](...continued)
to Plaintiff's Memorandum (Doc. #68).  The Court therefore excludes defendant's statement that plaintiff's leave after November 27, 2003 was unauthorized and a potential ground for termination.

[14]      Plaintiff also received no specific training on "facing," but she performed this task before her leave in July of 2003.

[15]      In December of 2003 and early 2004, Koch and assistant manager Brian McAuliffe did the scheduling for Store 5161.  On March 15, 2004, Robert Scott Henry became the assistant manager.  At that point, Henry and Koch did the scheduling for Store 5161.

[16]      In his declaration, Koch states in part that "[o]n or about April 9, 2005, Ms. Mondaine gave me a note from her doctor stating that she could work 32 hours per week."  Declaration Of Warren J. Koch ¶ 9, Exhibit Q to Defendants' Memorandum (Doc. #64).  Plaintiff seeks to strike the Koch declaration as an attempt to create a sham issue.  Plaintiff apparently does not dispute that Koch's reference to 2005 was inadvertent and that he intended to refer to 2004.  Plaintiff argues that Koch's reference to April 9, 2004 is a material alteration of his deposition testimony on the same issue.

In his deposition, Koch testified that he did not recall the exact date on which he received plaintiff's return-to-work certificate, but that he believed it was close to the time when plaintiff returned to work on March 17, 2004.  See Koch Depo. at 69.  Koch also testified that as of March 29, 2004, he was not sure if plaintiff had given him the return-to-work certificate.  See id. at 110.  Given that Koch included the phrase "on or about" in his declaration, the Court cannot find that his declaration directly contradicts his deposition testimony.  The Court therefore declines to strike Koch's declaration on this subject.  At the
(continued...)

testified that if she had known earlier that plaintiff was capable of working 32 hours per week, Osco would not have limited her schedule to two to four hours per day.  Store management had the discretion to determine plaintiff's schedule based on the needs of the store, however, and the available shifts.  Bauer also testified that because of the payroll crunch she might not have suggested a different schedule for plaintiff even if she had known about the 32 hours per week release.

On March 19, 2004, Dr. Mark Landry faxed Osco a note which stated that plaintiff needed to "elevate her foot 20 minutes for every two hours of work."  On March 31, 2004, Shilhanek informed plaintiff that under Osco policy and based on the instruction of the HR department, she needed to clock out at the beginning of her break and clock in at the end of her break.[17]

On March 22, 2004, plaintiff sent Bauer a letter which explained that (1) she did not receive proper training when she returned on March 17 because of the change in store lay-out; (2) on March 18, Shilhanek approached her with a duster and told her to do facing, dust and clean the entire store; (3) on March 18, Shilhanek was rude to her and told her that she had 33 facing errors, but showed her only ten errors; (4) Shilhanek reprimanded her for being too slow and claimed that she was not smiling at customers and that he would write this information in her file; (5) she thought that she was being retaliated

---

[16](...continued)
same time, the Court views the record in a light most favorable to plaintiff.  In doing so, the Court finds that plaintiff gave Koch the return-to-work certificate shortly after she returned to work on March 17, 2004. Plaintiff does not recall when she gave the amended certificate to Osco, but at some point she gave the note to Osco so that she could get more hours.  See Plaintiff's Depo. at 148-49 (plaintiff took note to Osco so that she could get more hours; plaintiff then called Shilhanek or Koch, who told her that they did not have more hours available and Shilhanek said that he was going by seniority); see id. at 150 (meeting with Shilhanek about issue took place after plaintiff returned to work on March 17, 2004).

[17]       Under Osco policy, employees received a break without clocking out if they were scheduled to work three and one half hours or more in a shift.

against for settling her worker's compensation claim and that she was being discriminated against because of her glaucoma; and (6) she was only scheduled to work nine hours per week. Plaintiff asked for a transfer to another store.

In March of 2004, Henry and Koch informed Shilhanek that plaintiff had not clocked out for several of her breaks. Pursuant to Bauer's instructions, Shilhanek adjusted plaintiff's time records to reflect the breaks for which management thought she had not clocked out. In fact, plaintiff never lied to Henry or any Osco manager about her breaks. During her first two days back from leave, plaintiff did not take a break. Shilhanek erroneously clocked plaintiff out for breaks on these days.

On March 25, 2004, Osco managers received a complaint from an employee who reported that plaintiff told her not to trust anyone at the store and that everyone at the store was prejudiced. Koch learned of the complaint and asked that employee, and two other employees who had heard similar comments, to send him a letter to explain what they had heard. By March 29, 2004, the three employees had submitted letters to Koch. One employee said that plaintiff constantly said negative things about other workers and called some of them – including Shilhanek and Koch – racist. Koch gave the letters to Shilhanek, who forwarded them to Bauer. Koch never discussed the letters with plaintiff.

On April 1, 2004, Dr. Landry faxed Osco a note which stated that plaintiff needed to "elevate her foot for 15 minutes after every two hours of work." Again, Shilhanek informed plaintiff that under Osco's policy, she needed to clock out during breaks.

On April 6, 2004, plaintiff sent Bauer another letter which explained that (1) she was concerned that her prior complaint was not confidential because Shilhanek had approached her and said that he did not appreciate her telling HR his business; (2) Shilhanek threw the break policy at her; (3) Shilhanek

followed her around the store; and (4) Shilhanek clocked her out for breaks that she did not take.  Plaintiff

again asked for a transfer to another store.

After Bauer received plaintiff's letter of March 22, 2004, she directed Joe Egan, an Osco loss

prevention representative, to investigate plaintiff's claims.  Egan's job was to gather all of the facts relating

to plaintiff's complaint and report back to Bauer and Sandra Zubik, an Osco in-house attorney and director

of labor relations.  Shilhanek and Koch knew that Egan went to the store to investigate plaintiff's complaints

against Shilhanek.  During his investigation, Egan interviewed plaintiff, but not Shilhanek.  Bauer and Zubik

reviewed Egan's findings.  Bauer assumed that Egan had interviewed Shilhanek and considered it unusual

that he did not do so.  After receiving Egan's report, Bauer determined that "there did not appear to be any

discriminatory practice happening currently against plaintiff."

On April 7, 2004, plaintiff completed an availability form requesting 32 hours of work per week

and transfer to another store.  Plaintiff needed more hours to retain her benefits.[18]  After April 7, 2004,

plaintiff had no further direct contact with Shilhanek.

Sometime after April 3, 2004, Shilhanek prepared a memorandum which outlined his interactions

with plaintiff and described her as "delusional."  Shilhanek also outlined a meeting with plaintiff on April 3,

2004 to discuss the break policy.  On April 15, 2004, Shilhanek prepared a synopsis of an encounter with

plaintiff on April 3, 2004, shortly after he informed her of the break policy.[19]

---

[18]      On March 29, 2004, Osco's Benefit Department advised plaintiff that if she did not work
28 hours per week, her benefits would terminate.  Koch and Bauer also understood this fact.

[19]      Shilhanek does not recall who instructed him to prepare the synopsis or why he waited
12 days to prepare it.  Shilhanek testified that no one at Osco talked to him about any documents that he
put in plaintiff's employment file.  Bauer reviewed the memorandum which referred to plaintiff as delusional,
however, and she cautioned Shilhanek not to make such statements.

On April 15, 2004, Osco's Benefit Department sent plaintiff, Shilhanek and Koch a letter which stated that it could not substantiate the medical necessity for plaintiff's absence from November 27, 2003 through February 26, 2004, and that it had therefore designated the absence as unpaid FMLA leave.[20] The letter informed plaintiff that if she wanted Osco to continue to consider her disability claim for the period from November 27, 2003 through February 26, 2004, she would need to submit medical documentation within 45 days.[21] Bauer does not recall learning that plaintiff was ever placed on FMLA

---

[20]     Osco does not designate paid disability leave as FMLA leave and under Osco policy, the two types of leaves do not run concurrently.  If plaintiff qualified for paid disability leave from November 27, 2003 through February 26, 2004, her absence during that period would not have counted as FMLA leave.  Osco did not notify plaintiff that she would be receiving unpaid FMLA leave if it ultimately denied her claim for paid disability leave.  Furthermore, between November 27, 2003 and February 26, 2004, Osco never notified plaintiff that if she failed to return to work by February 26, 2004, her FMLA leave would have expired and she would not be returned to the position she held before her leave.

Because Osco designated plaintiff's leave from November 27, 2003 through February 26, 2004 as FMLA leave, her health care benefits premium was $10.85 per week (the active employee rate) instead of $69.87 per week (the non-active employee rate) for that period.  From February 27 through March 16, 2004, Osco continued to retain plaintiff as an "active" employee and continued to bridge her health care benefits.  Plaintiff seeks to exclude evidence about her health care benefits because they are included in Dallito's declaration, and he allegedly lacks personal knowledge of the statements contained therein.  In support of her argument, plaintiff refers to 53 statements of fact, none of which address Dallito's knowledge of these facts.  Dallito has been Osco's benefits administration manager for the past 12 years and based on his review of plaintiff's employment file and his knowledge of Osco policies and procedures, he is competent to testify regarding these issues.  The Court therefore overrules plaintiff's objection to his declaration.

[21]     Dallito did not ask anyone at Osco whether they had received physician records for this time period and he did not know that plaintiff had given physician records to her general manager.  Dallito admitted that absence reports would help in determining whether plaintiff qualified for disability leave. Dallito testified that he does not know what policies and procedures Osco follows to ensure that FMLA requirements are met when an employee returns from FMLA leave.

- 15 -

leave.[22]  Shilhanek and Koch learned that plaintiff had been on FMLA leave in August of 2005, long after plaintiff filed this lawsuit.

On April 28, 2004, Koch gave plaintiff an Associate Coaching / Training Form.  The form was not disciplinary in nature.  Rather, it was a teaching tool.

In 2004, Osco policy required that associates receive performance reviews on an annual basis. Although plaintiff started working for Osco on November 5, 2001, Koch gave plaintiff her first performance review on May 1, 2004.  Koch and Shilhanek discussed the review and Koch noted that plaintiff did not meet requirements.  Shortly after Koch gave plaintiff the review, he sent an e-mail to Deone Peterson (Osco's district manager), Bauer, Shilhanek and Zubik informing them that plaintiff refused to sign her performance review.

On May 5, 2004, at approximately 2:00 p.m., Peterson called Bauer to resolve ongoing issues regarding plaintiff, including plaintiff's accusations of harassment and hostile work environment.  Bauer told Peterson to contact Zubik for guidance.

At approximately 7:00 p.m. on May 5, 2004, Koch gave plaintiff a CAAR because she had placed security tags on trial size bottles of Listerine on April 21, 2004.  Plaintiff admits that she made the error, but claims that it was due to her glaucoma.  The CAAR indicates that plaintiff had received a disciplinary review on March 18, 2004.  Osco has no written record of such a review, but Shilhanek had given plaintiff a verbal reprimand on that date for facing errors.  Plaintiff refused to sign the CAAR.  Koch believed that plaintiff's attitude would prevent her from being productive and told plaintiff that if she refused to sign the

---

[22]     Bauer testified that when working with managers, it is important for her to know when an employee is returning from FMLA leave so that the position and pay rate of the returning employee can be properly calculated.

review, he would send her home and she could not return until she signed it.  Koch then sent her home and

told her not to come back unless she signed the CAAR.[23]

Koch called Bauer to find out what to do next about plaintiff.  Bauer told Koch to call plaintiff and

tell her that he expected her to report for her next shift which was scheduled for Saturday, May 8.  On

Friday, May 7, 2004, Koch telephoned plaintiff and asked her to report to work for her shift the next day,

May 8.  May 8 was the last day that plaintiff reported to work.  Plaintiff testified that she worked with

Koch and that nothing bad happened that day.

On May 11, 2004, plaintiff sent Bauer a third letter.  Plaintiff explained that Koch gave her a

CAAR on May 5, then called her on May 7 and told her to show up the next day.  Plaintiff stated that she

had not been accommodated fairly and that she had suffered mental anguish, humiliation, pain and suffering.

On May 17, 2004, plaintiff sought medical treatment from Dr. John Henderson, Jr.  Shortly

thereafter, plaintiff gave Osco a note from Dr. Henderson which stated that plaintiff was under his care for

a "disabling condition caused by the stress of her present working conditions" and that her disability began

"5/10/04."

On May 28, 2004, Bauer responded to plaintiff's letter of May 11.  Bauer explained that she had

been out of the office for the past two weeks, but that she would investigate plaintiff's concerns.  Bauer

asked plaintiff to provide specific examples of her concerns.

---

[23]     Osco does not have a written policy of sending employees home for refusing to sign CAAR
forms.  Shilhanek testified that he did not instruct Koch to send plaintiff home if she refused to sign the
CAAR, but Koch testified that Shilhanek did so.  Koch testified that he also discussed the issue with Bauer,
who told him that if plaintiff did not have a productive attitude, he should send her home.  Bauer does not
recall the conversation.

Osco and Shilhanek did not learn about plaintiff's EEOC charge until shortly after the EEOC dismissed it on May 28, 2004.

On June 8, 2004, Bauer sent plaintiff another copy of a report to be completed by her physician. Bauer advised plaintiff that she must have the report completed and returned no later than June 16 or Osco would consider her to have voluntarily resigned. Osco did not receive anything from plaintiff by June 16. Shortly after June 24, 2004, however, plaintiff mailed Osco a note from Dr. Henderson dated June 24, 2004. The note stated that plaintiff was being treated for major depressive disorder and dysthymic disorder and that she was "unable to be employed with Osco." Plaintiff testified that Dr. Henderson's note was meant to serve as the report which Osco had requested.

More than a month later, on July 29, 2004, plaintiff mailed Osco a handwritten notice of resignation and filed suit against Osco and Shilhanek. Plaintiff alleges that because of her disability and in retaliation for her worker's compensation claim, her EEOC complaint and the exercise of her rights under the FMLA and Section 1981, Osco (1) reduced her hours to nine hours per week; (2) changed her work schedule to evening and weekend shifts; (3) limited her hours by requiring her to clock out during breaks; (4) suspended her for refusing to sign a CAAR;[24] and (5) constructively discharged her.[25] Pretrial Order

---

[24] Plaintiff alleges that when Koch told her to go home until she signed the CAAR, Osco effectively suspended her. The suspension lasted for the remainder of plaintiff's shift on May 5, 2004 and plaintiff's shift on May 6, 2004. On May 7, 2004, Koch asked plaintiff to return to work for her next scheduled shift, which was the following day, Saturday, May 8, 2004.

[25] In her brief in opposition to defendants' motion for summary judgment, plaintiff claims that Osco took seven adverse employment actions: (1) reduced her hours; (2) reduced her pay; (3) took actions that effectively eliminated her health and other benefits; (4) changed her work schedule; (5) limited her hours by requiring her to clock out for breaks; (6) suspended her for refusing to sign a CAAR and (7) constructively discharged her. See Plaintiff's Memorandum (Doc. #68) at 71. Plaintiff does not explain how Osco reduced her pay. Osco retained plaintiff on the same salary schedule before and after her leave.

(continued...)

(Doc. #67) at 6-7.  Plaintiff asserts retaliation claims under Title VII (claim 1 against Osco), Section 1981 (claim 2 against Osco and Shilhanek), the ADA (claim 4 against Osco), the ADEA (claim 5 against Osco), the FMLA (claim 7 against Osco and Shilhanek) and Kansas common law (claim 8 against Osco and Shilhanek).  See id.  Plaintiff also asserts claims of discrimination and failure to accommodate under the ADA (claim 3 against Osco).  Finally, plaintiff alleges that Osco and Shilhanek violated the FMLA by (1) denying her request for FMLA leave sometime between April and July of 2003 and failing to notify her of her FMLA rights; (2) failing to notify plaintiff, during her leave or within two days after her return from leave, that absences starting on November 27, 2003 were counting as FMLA leave; and (3) failing to return plaintiff to an equivalent position following her return from FMLA leave in March of 2004 (claim 6 against Osco and Shilhanek).  See id. at 7, 11-12.

On July 27, 2005, plaintiff completed an on-line application for a position with Osco's Loss Prevention Department.  In that application, plaintiff stated that she had voluntarily quit her prior job at Osco.[26]

---

[25](...continued)
Likewise, other than reducing plaintiff's hours and changing her schedule to evening and weekend shifts, plaintiff does not explain what actions Osco took to effectively eliminate her benefits.  The Court considers plaintiff's claims for reduced pay and elimination of benefits as part of her claims that Osco reduced her hours and changed her work schedule to evening and weekend shifts.

[26]      Plaintiff argues that her employment application is not admissible because Osco did not produce it before the discovery deadline (August 15, 2005) or designate a corporate representative on the issue in response to plaintiff's discovery requests.  Defense counsel maintains that they did not learn of plaintiff's on-line application until August 28, 2005, after the close of discovery.  The Court declines to exclude plaintiff's application.  Defendants produced the on-line application in support of the motion for summary judgment, which was filed five days after counsel discovered the application.  Moreover, plaintiff can hardly claim surprise or prejudice because the application reflects her own statements which she made only one month before defendants filed their motion for summary judgment.

## Analysis

Defendants argue that they are entitled to summary judgment because (1) plaintiff cannot establish that they constructively discharged her; (2) on her retaliation claims, plaintiff cannot establish a causal connection between her protected activity and any adverse employment actions or that defendants' reasons for any adverse employment action are a pretext for retaliation; and (3) on her ADA discrimination and accommodation claims, she cannot establish that she is disabled, that Osco discriminated against her or that she requested an accommodation.  With regard to plaintiff's FMLA claim, defendants argue that as a matter of law, (1) plaintiff cannot assert an independent claim for failure to give notice; (2) the FMLA designation did not prejudice plaintiff; and (3) plaintiff was not protected under the FMLA when she returned to work in March of 2004.

Shilhanek further argues that he was not an employer under the FMLA and that he cannot be individually liable under that statute.  Plaintiff does not dispute Shilhanek's argument.  Under the FMLA, the term "employer" includes "any person who acts, directly or indirectly, in the interest of the employer to any of the employees of such employer."  29 U.S.C. § 2611(4)(A)(ii)(I).  FMLA regulations provide that this definition applies to "individuals such as corporate officers acting in the interest of an employer."  29 C.F.R. § 825.104(d) (same standard as "employer" under the Fair Labor Standards Act, 29 U.S.C. § 203(d)).  Because plaintiff has not shown that Shilhanek had a corporate role beyond his managerial position, the Court grants Shilhanek summary judgment on plaintiff's FMLA claims.  See Williamson v. Deluxe Fin. Servs., No. 03-2358-KHV, 2005 WL 1593603, at *9 (D. Kan. July 6, 2005) (supervisor and HR manager did not have sufficient responsibility or stature within company to warrant imposition of personal liability under FMLA); Brunelle v. Cytec Plastics, Inc., 225 F. Supp.2d 67, 81 (D. Me. 2002)

(front-line supervisor who was personally responsible for decisions that contributed to denial of FMLA leave not sufficiently prominent in employer's operations to be "employer" under FMLA).

Shilhanek also argues that under Kansas law, he cannot be individually liable for worker's compensation retaliation.  Again, plaintiff does not dispute Shilhanek's argument.  Because plaintiff has not shown that Shilhanek occupied a corporate role beyond his managerial position, the Court grants Shilhanek summary judgment on plaintiff's worker's compensation retaliation claim under Kansas law.  See Rebarchek v. Farmers Co-op. Elevator, 272 Kan. 546, 562, 35 P.3d 892, 904 (2001) (only employer liable for worker's compensation retaliatory discharge).

## I.       Constructive Discharge

Defendants argue that as a matter of law, plaintiff cannot show constructive discharge.  An employee who is not formally discharged from employment may still be constructively discharged if the employer, by its illegal discriminatory acts, has made working conditions so difficult that a reasonable person in plaintiff's position would feel compelled to resign.  See Derr v. Gulf Oil Corp., 796 F.2d 340, 344 (10th Cir. 1986).  Essentially, plaintiff must show that she had "no other choice but to quit."  Yearous v. Niobrara County Mem'l Hosp., 128 F.3d 1351, 1356 (10th Cir. 1997); Woodward v. City of Worland, 977 F.2d 1392, 1401 (10th Cir. 1992), cert. denied, 509 U.S. 923 (1993).  The conditions of employment must be objectively intolerable; plaintiff's subjective views of the situation are irrelevant. Sanchez v. Denver Pub. Schs., 164 F.3d 527, 534 (10th Cir. 1998); see Yearous, 128 F.3d at 1356.

Plaintiff contends that the following facts are sufficient for a jury to conclude that defendants constructively discharged her:

1.       Osco scheduled her to work the night shift.

2.     Osco knew that plaintiff needed 28 hours per week to retain her benefits, but it scheduled her for only nine hours per week.

3.     On the first night plaintiff returned to work in March of 2004, Shilhanek greeted plaintiff with a duster and told her to clean the store.

4.     Shilhanek began following plaintiff around the store and started documenting her every move.

5.     Management asked plaintiff's co-workers to document their interaction with plaintiff.

6.     Plaintiff was given a performance review with a rating of "does not meet requirements."

7.     Plaintiff received a CAAR for placing security tags on trial size bottles of Listerine and was suspended for failing to sign the CAAR.

8.     Koch called plaintiff on the Friday before Mother's Day and demanded that plaintiff come to work the next day.

9.     Plaintiff was diagnosed with severe stress.

10.    Plaintiff wrote to Bauer, but received no response for two weeks.

Plaintiff's Memorandum (Doc. #68) at 90-91.

Plaintiff has not raised a genuine issue of material fact whether she had no choice but to quit. Scheduling changes to work night shifts and the day before Mother's day on one-day notice (reasons 1 and 8) are not adverse employment actions and certainly do not create an intolerable working environment. See Leavitt v. Wal-Mart Stores, Inc., 74 Fed. Appx. 66, 69 (1st Cir. Aug. 27, 2003) (failure to accommodate requests for transfer and more day shifts and failure to follow policy in awarding day shifts not so severe and unpleasant that staying on job would have been objectively intolerable). A scheduling change which results in loss of benefits (reason 2) may be considered an adverse action, but it does not create an objectively intolerable working environment. Plaintiff's subjective view that management gave

her less desirable jobs, closely monitored her, unfairly gave her a CAAR and suspended her for refusing to sign the CAAR (reasons 3, 4, 5 and 7) is insufficient to show that the workplace was intolerable.  See Tran v. Trustees of State Colls. in Colo., 355 F.3d 1263, 1271 (10th Cir. 2004) (employee's distress at close monitoring not sufficient proof that workplace was objectively intolerable); Heno v. Sprint/United Mgmt. Co., 208 F.3d 847, 857-58 (10th Cir. 2000) (plaintiff's subjective belief that co-employees were isolating her irrelevant); Sanchez, 164 F.3d at 534 (plaintiff's subjective views irrelevant).  A negative performance review (reason 6) is generally insufficient to constitute an adverse employment action and likewise is insufficient to compel a reasonable person to quit.  See Rennard v. Woodworker's Supply, Inc., 101 Fed. Appx. 296, 308 (10th Cir. June 9, 2004) (written reprimand and negative evaluation did not alter job status and were not adverse employment actions); Munoz v. W. Res., Inc., 225 F. Supp.2d 1265, 1270 (D. Kan. 2002) (poor rating without more serious consequences insufficient to show adverse employment action).

Plaintiff admits that "nothing bad" happened on her last day of work, Saturday, May 8.  Plaintiff claims that Bauer's two-week delay in responding to her letter of May 11 was intolerable (reason 10), but Bauer apologized for the delay and explained that she had been out of the office for two weeks.  Bauer told plaintiff that she would investigate plaintiff's concerns.  Bauer asked plaintiff to provide specific examples of her concerns by mail, fax or e-mail.  The record contains no evidence that plaintiff followed up with Bauer.  See Woodward v. City of Worland, 977 F.2d 1392, 1402 (10th Cir. 1992) (reasonable person generally will file internal grievance before resigning based on intolerable working conditions unless such procedure would be futile); see also Ugalde v. W.A. McKenzie Asphalt Co., 990 F.2d 239, 243 (5th Cir. 1993) (instead of resigning, reasonable employee would complete internal grievance procedure or file

EEOC claim).  On June 8, 2004, Bauer advised plaintiff that no later than June 16, she must complete and return a report of her attending physician or Osco would consider plaintiff to have voluntarily resigned. Plaintiff did not respond until shortly after June 24, 2004, when plaintiff mailed Bauer a note from Dr. Henderson which stated that plaintiff was "unable to be employed with Osco."  Plaintiff did not submit her resignation until July 29, 2004, some 12 weeks after her last day of work.  Just this summer, long after she filed this lawsuit, plaintiff completed an employment application which reported to Osco that she had "voluntarily quit" her prior job at Osco.  Viewing the facts in the light most favorable to plaintiff, no jury could find that a reasonable person in plaintiff's circumstances "would have felt compelled to resign as the only feasible option."  Rennard, 101 Fed. Appx. at 309.  The Court therefore sustains defendants' motion for summary judgment on plaintiff's allegation of constructive discharge.

## II.    Retaliation Claims - Prima Facie Case

Plaintiff alleges that in retaliation for her worker's compensation claim, her EEOC complaint and the exercise of her rights under the ADA, the FMLA, Title VII and Section 1981, defendants (1) reduced her hours to nine hours per week; (2) changed her work schedule to evening and weekend shifts; (3) limited her hours by requiring her to clock out during breaks; and (4) suspended her for refusing to sign a CAAR.[27]  Plaintiff's Memorandum (Doc. #68) at 71.  Defendants argue that they are entitled to summary judgment on plaintiff's retaliation claims because plaintiff cannot show a causal connection between her alleged protected activity and any adverse employment action.[28]

---

[27]    For reasons set forth above, defendant is entitled to summary judgment on plaintiff's allegation that defendants constructively discharged her.  Accordingly, the Court need not analyze plaintiff's constructive discharge as an additional adverse employment action.

[28]    Defendants argue that the change in plaintiff's work schedule was not an adverse
(continued...)

To establish a prima facie case of retaliation, plaintiff must show that (1) she engaged in protected opposition to discrimination; (2) she suffered an adverse employment action; and (3) a causal connection links the protected activity and the adverse employment action. O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1258 (10th Cir. 2001). Plaintiff can establish the causal connection by "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." Burrus v. United Tel. Co. of Kan., Inc., 683 F.2d 339, 343 (10th Cir. 1982).

A.      Retaliation Based On Complaints Of Age And Race Discrimination

Defendants argue that plaintiff cannot establish a causal connection between her complaints of age and race discrimination and any adverse employment actions because (1) plaintiff admits that she did not complain to anyone at Osco about age or race discrimination and (2) the alleged adverse employment actions occurred before defendants learned in May of 2004 that plaintiff had filed an EEOC charge. Plaintiff does not dispute that defendants first learned of her EEOC charge in late May of 2004. To show protected activity before the alleged acts of retaliation, plaintiff relies on two letters to Bauer, about specific instances of discrimination and retaliation, on March 22 and April 6, 2004. See Plaintiff's Memorandum (Doc. #68) at 72-74. Neither letter complains of age or race discrimination. In the first letter dated March 22, 2004, plaintiff advised Bauer as follows:

_____

[28](...continued)
employment action, but for purposes of their motion, they concede that a decrease in hours is an adverse employment action. Because plaintiff alleges that the change in her work schedule to evening and weekend shifts caused the decrease in her total hours and loss of health benefits, the Court assumes that the change in plaintiff's work schedule constitutes an adverse employment action.

Defendants also argue that the CAAR itself is not an adverse employment action because it did not result in the loss of pay or benefits. See Defendants' Memorandum (Doc. #64) at 21. This argument misses the point. Plaintiff claims that the adverse employment action was her suspension for refusing to sign the CAAR – not the CAAR itself. See Plaintiff's Memorandum (Doc. #68) at 71.

> I feel as though I am being harassed and retaliated against for returning back to work due
> to my injury settlement hearing.  I also feel as though [Shilhanek] is discriminating against
> my disability, I also have glaucoma and it is very difficult for me to see at night.

Exhibit 17 to Plaintiff's Memorandum (Doc. #68).  Likewise, in the letter dated April 6, 2004, plaintiff referred to harsh treatment by Shilhanek but never alleged that any of his actions were motivated by age or race.  See Exhibit 18 to Plaintiff's Memorandum (Doc. #68).

The Court finds some record evidence, though not cited by plaintiff, that plaintiff complained of race discrimination.[29]  On March 25, 2004, Osco managers received an employee complaint that plaintiff had told her that everyone at the store was prejudiced.  Shortly thereafter, two of plaintiff's co-workers advised Koch that plaintiff thought some of her supervisors (including Shilhanek and Koch) were racist.  Koch gave this information to Shilhanek, who forwarded it to Bauer.  Plaintiff's complaints to her co-workers that everyone was prejudiced and that her supervisors were racist constitute "protected activity" under Title VII and Section 1981 because those comments were passed on to management.  See Neiderlander v. Am. Video Glass Co., 80 Fed. Appx. 256, 261 (3d Cir. 2003); Zowayyed v. Lowen Co., 735 F. Supp. 1497, 1504 (D. Kan. 1990).

Viewing the record in the light most favorable to plaintiff, plaintiff engaged in protected activity against race discrimination which defendants first learned about on March 25, 2004.  Because defendants took the first two alleged adverse employment actions before that date (reducing plaintiff's hours to nine hours per week and changing her work schedule to evening and weekend shifts), plaintiff cannot show a

---

[29]     Plaintiff fails to cite her own deposition testimony, which states that at some point she complained to Shilhanek about age and race discrimination.  See Plaintiff's Depo. at 298-99.  Plaintiff cannot recall when or what she told Shilhanek about age or race discrimination.  See id.  Plaintiff's vague references are insufficient to show a causal connection between her complaints of age and race discrimination and any adverse employment action.

causal connection between her protected activity and the adverse employment actions. As to the final two adverse employment actions (requiring her to clock out during breaks and suspending her), defendants first learned of plaintiff's complaint of race discrimination on March 25, 2004. Six days later, Shilhanek informed plaintiff that she needed to clock out during breaks. On May 5, 2004, six weeks after defendants learned of plaintiff's complaint, Osco suspended plaintiff. Based on the temporal proximity, plaintiff has demonstrated a prima facie case of a causal connection between her protected activity against race discrimination and defendants' adverse employment actions.

Viewing the record in the light most favorable to plaintiff, plaintiff engaged in protected activity under the ADEA by filing an EEOC complaint which defendants first learned about in late May of 2004, after they took the alleged adverse employment actions. Except for her EEOC charge, plaintiff has not shown that she engaged in protected activity under the ADEA. Accordingly, as a matter of law, plaintiff cannot show a causal connection between her protected activity under the ADEA and any adverse employment action.

In sum, the Court sustains defendants' motion for summary judgment on (1) plaintiff's claims that defendants reduced her hours and changed her work schedule because of her complaints of race discrimination and (2) all claims that Osco retaliated against plaintiff because of complaints of age discrimination. As to plaintiff's claims that defendants required her to clock out for breaks and suspended her because of her complaints of race discrimination, plaintiff has established a prima facie case.

B.    Retaliation Based On Protected Activity Under The ADA

Osco argues that plaintiff cannot establish a causal connection between the filing of her complaints under the ADA and any adverse employment actions because (1) Osco did not learn that plaintiff had filed

an EEOC charge until late May of 2004, after the alleged adverse employment actions and (2) plaintiff did not engage in any other "protected activity" under the ADA.  Again, plaintiff does not contest the fact that Osco learned of her EEOC charge after the alleged adverse employment actions.  Plaintiff, however, maintains that in December of 2003 and March of 2004, she engaged in protected activity by requesting an accommodation for her glaucoma.  In particular, on December 12, 2003, plaintiff asked to work days because her glaucoma made it difficult to drive at night.  On March 22, 2004, plaintiff informed Bauer that she was scheduled for two evenings, that her glaucoma made it difficult to see at night and that she wanted a transfer to another store.  On April 6, 2004, plaintiff again requested a transfer to another store.

A request for accommodation can constitute protected activity under the ADA.  See Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003); Allen v. Verizon Pa., Inc., No. 04-cv-1515, 2005 WL 2035858, at *14 (M.D. Pa. Aug. 23, 2005); McClurg v. GTECH Corp., 61 F. Supp.2d 1150, 1162 (D. Kan. 1999).  Viewing the evidence in a light most favorable to plaintiff, she engaged in protected activity under the ADA on December 12, 2003, March 22, 2004 and April 6, 2004.[30]

---

[30]     In its reply, Osco argues that plaintiff's request for accommodation is not protected activity under the ADA.  See Defendants' Reply (Doc. #70) at 4 (citing Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1261 (11th Cir. 2001); Parker v. Noble Roman's Inc., No. IP-96-0065-C-D/F, 1997 WL 839138 (S.D. Ind. Dec. 10, 1997)).  The Court disagrees.  See Wright, 352 F.3d at 478; Allen, 2005 WL 2035858, at *14; McClurg, 61 F. Supp.2d at 1161-62.  Lucas stands for the proposition that where the alleged adverse employment action is the same as the action constituting the failure to accommodate, a failure of proof on the reasonable accommodation claim precludes a retaliation claim based on the same facts.  See Lucas, 257 F.3d at 1261.  Parker held that where the alleged adverse employment action is the same as the action constituting the failure to accommodate, plaintiff cannot maintain a retaliation claim.  See Parker, 1997 WL 839138, at *8.  Here, three of the four adverse employment actions involve decisions not directly related to the alleged failure to accommodate, i.e. all of the adverse employment actions except Osco's decision to offer plaintiff only evening and weekend shifts.  In addition, the Court need not decide whether plaintiff can maintain a separate retaliation claim for Osco's decision to offer plaintiff only evening and weekend shifts because the Court sustains defendants' motion for summary judgment on that claim on other grounds.

On December 12, 2003, Shilhanek told plaintiff that because of payroll constraints, Store 5161 could offer her only evening and weekend hours.  Plaintiff responded that she could not work evenings because her glaucoma made it difficult to drive at night.  Plaintiff has not shown that she asked to work days *before* Shilhanek told her what hours were available.  Accordingly, plaintiff cannot show a causal connection between her request for accommodation and Osco's decision to change her work schedule to evening and weekend shifts.

Furthermore, plaintiff has not shown a causal connection between her request to work days on December 12, 2003 and Osco's decision to reduce her hours to nine hours per week starting March 17, 2004.  The Tenth Circuit has held that "[t]he causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action."  Burrus, 683 F.2d at 343.  Unless the adverse action is "very closely" connected in time to the protected activity, plaintiff must rely on additional evidence beyond mere temporal proximity to establish causation.  Meiners v. Univ. of Kan., 359 F.3d 1222, 1231 (10th Cir. 2004); see Miller v. Auto. Club Of N.M., Inc., 420 F.3d 1098, 1121 (10th Cir. 2005); Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999).  In Meiners, the Tenth Circuit held that a three-month period, standing alone, is insufficient to show causation.  See Meiners, 359 F.3d at 1231.  Here, the gap is 96 days, slightly more than three months.  Plaintiff has not presented additional evidence to establish a causal connection between her request on December 12, 2003 and defendant's decision to reduce her hours beginning March 17, 2004.  Plaintiff therefore has not established a prima facie case on this claim.

The Court next analyzes whether the record reveals a causal connection between plaintiff's request to transfer to another store on March 22, 2004 and Osco's decision to require plaintiff to clock out during

breaks. On March 19, 2004, Dr. Landry faxed Osco a note which stated that plaintiff needed to "elevate her foot 20 minutes for every two hours of work." On March 22, 2004, plaintiff requested a transfer to another store. On March 31, 2004, Shilhanek informed plaintiff that under Osco policy and based on the instruction of the HR department, she needed to clock out during breaks. The temporal proximity between plaintiff's request for a transfer and Osco's decision to have her clock out during breaks (nine days) is sufficiently close, by itself, to establish a causal connection. Likewise, the temporal proximity between plaintiff's requests for a transfer (March 22 and April 6, 2004) and her suspension (May 5, 2004) is sufficient to establish causation for purposes of a prima facie case.

In sum, because plaintiff has not established a prima facie case, the Court sustains defendants' motion for summary judgment on plaintiff's claims that Osco reduced her hours and changed her work schedule because of her requests for accommodation under the ADA. As to plaintiff's claims that Osco required her to clock out during breaks and suspended her because of her requests for accommodation under the ADA, plaintiff has established a prima facie case.

C.      Retaliation Based On Plaintiff's Protected Activity Under FMLA

Defendants argue that plaintiff cannot establish a causal connection between her protected activity under the FMLA and any adverse employment action. As explained above, plaintiff was on paid disability leave from July through November 26, 2003. Plaintiff claims that in early December of 2003, she attempted to return to work by giving Osco Dr. Gamble's note which stated that she could work two to four hours per day. Plaintiff asserts that at that time, she was returning from FMLA leave which allegedly began on November 27, 2003.[31]  See Plaintiff's Memorandum (Doc. #68) at 76. Plaintiff claims that in

---

[31]      For purposes of defendants' motion for summary judgment, the Court assumes that
(continued...)

retaliation for her FMLA leave beginning November 27, 2003, defendants (1) accused her of falsifying her return-to-work certificate in December of 2003, (2) refused to return her to work in December of 2003, (3) waited to return her to work until March 17, 2004, even though her FMLA leave terminated on February 26, 2003, (4) changed her work schedule to evening and weekend shifts, (5) reduced her hours to nine hours a week, (6) required her to clock out during breaks and (7) suspended her.[32]  See Plaintiff's Memorandum (Doc. #68) at 76-78; Pretrial Order (Doc. #67) at 12.

Plaintiff's claim starts from a flawed premise because (1) plaintiff never requested FMLA leave for the period after November 26, 2003 and (2) neither plaintiff nor defendants knew of the retroactive FMLA leave designation until April 15, 2004.  On April 15, 2004, Osco notified plaintiff that because it was unable to substantiate the medical necessity for her absence from November 27, 2003 through February 26, 2004, it had placed her on unpaid FMLA leave for that period.  Because defendants took the first six alleged

---

[31](...continued)
plaintiff's return from FMLA leave is protected activity under the FMLA.

[32]      In the pretrial order and plaintiff's brief in opposition to defendants' motion for summary judgment, plaintiff does not set forth the first three actions as separate adverse employment actions.  As to plaintiff's statement that defendants accused her of falsifying her return-to-work certificate, such conduct is not an adverse employment action.  See Wells v. Colo. Dept. of Transp., 325 F.3d 1205, 1214 (10th Cir. 2003) (supervisor's unsubstantiated oral reprimands not materially adverse employment actions); Sanchez, 164 F.3d at 533 (same); Benningfield v. City of Houston, 157 F.3d 369, 376 (5th Cir. 1998) (mere accusations not adverse employment actions), cert. denied, 526 U.S. 1065 (1999).  As to defendants' failure to return plaintiff to work in December of 2003 or at the conclusion of her FMLA leave on February 27, 2004, those actions are intertwined with the adverse employment actions of offering plaintiff only evening and weekend shifts and scheduling plaintiff only nine work hours a week.  For example, plaintiff claims that in December of 2003, defendants did not return her to work day shifts, but she acknowledges that defendants did offer her evening and weekend shifts.  As to plaintiff's claim that defendants did not return plaintiff to work at the conclusion of her FMLA leave, plaintiff primarily complains that defendants did not return her to day shifts at 32 hours a week.  For reasons explained below, even if the Court analyzed plaintiff's FMLA retaliation claim with the three additional adverse employment actions, the Court would sustain defendants' motion for summary judgment on the claim.

adverse employment actions well before April 15, 2004 (the date plaintiff and defendants first knew that she was on FMLA leave), plaintiff cannot show a causal connection between her protected activity under the FMLA and the adverse employment actions (accusing plaintiff of falsifying her return-to-work certificate, not returning her to work in December of 2003 or at the end of her FMLA leave in February of 2004, changing her work schedule to evening and weekend shifts, reducing her hours to nine hours per week, and requiring her to clock out during breaks).

The final adverse employment action (suspending plaintiff) followed shortly after Osco designated her absence through February 26, 2004 as FMLA leave, but plaintiff has not shown a causal connection between Osco's *sua sponte* declaration of plaintiff's absence as FMLA leave and the adverse employment action. As explained above, plaintiff did not request FMLA leave for the period after November 26, 2003. Indeed, except for an informal request to Shilhanek in the spring of 2003, plaintiff never requested FMLA leave. Osco, not plaintiff, decided to designate her leave as FMLA leave. Plaintiff has not offered evidence of circumstances that justify an inference why Osco would retaliate against plaintiff for exercising her FMLA rights from November 27, 2003 to February 26, 2004, when she in fact did not exercise her FMLA rights and Osco unilaterally granted her those rights. See Burrus, 683 F.2d at 343. The Court therefore sustains defendants' motion for summary judgment on plaintiff's claims that defendants retaliated against plaintiff because of protected activity under the FMLA.

### D.     Retaliation Based On Plaintiff's Worker's Compensation Claim

Defendants argue that plaintiff cannot establish a causal connection between the filing of her worker's compensation claim and any adverse employment action. In particular, defendants note that plaintiff filed her worker's compensation claim in July of 2003 and that the alleged adverse actions primarily

took place after plaintiff returned to work in March of 2004.  Plaintiff emphasizes that the adverse actions

began upon her return to work, only five days after she had settled her worker's compensation claim.[33]

On December 12, 2003, Osco notified plaintiff that it could only offer evening and weekend shifts.

Plaintiff cannot show a causal connection between that decision and the settlement of her worker's

compensation claim, which occurred three months later, in March of 2004.  Furthermore, the record

contains no evidence that Koch and Henry, who reduced plaintiff's hours to nine hours a week in March

of 2004, knew that plaintiff had filed or settled a worker's compensation claim.[34]  As to the decisions to

require plaintiff to clock out during breaks and to suspend her, the temporal proximity of the settlement of

plaintiff's worker's compensation claim and those decisions is sufficient to establish a prima facie case of

a causal connection.

The Court therefore sustains defendants' motion for summary judgment on plaintiff's claim that

Osco changed plaintiff's work schedule to evening and weekend shifts and scheduled plaintiff only

nine hours per week in retaliation for her worker's compensation claim.  As to plaintiff's claims that Osco

required her to clock out during breaks and suspended her in retaliation for her worker's compensation

claim, plaintiff has established a prima facie case.

---

[33]     Plaintiff does not precisely articulate how Osco's decision to pay $2,500 to settle her worker's compensation claim constitutes protected activity by her.  Defendants, however, do not directly dispute plaintiff's argument on this point.  For purposes of defendants' motion for summary judgment, the Court therefore assumes that plaintiff's settlement of her worker's compensation claim constitutes protected activity under Kansas law.

[34]     The same reasoning does not apply to Koch's decision to suspend plaintiff.  Koch testified that he acted in part on Shilhanek's instruction to send plaintiff home if she did not sign the CAAR.  Shilhanek knew that plaintiff had filed a worker's compensation claim in July of 2003 and that she had settled that claim in March of 2004.

### III.    Retaliation Claims - Pretext Analysis

For purposes of defendants' motion for summary judgment, plaintiff has established a prima facie case on the following retaliation claims: (1) Osco and Shilhanek required plaintiff to clock out for breaks and suspended her because she complained of race discrimination; and (2) Osco required plaintiff to clock out for breaks and suspended her because of protected activity under the ADA and because she filed and settled a worker's compensation claim.[35]

Plaintiff's establishment of a prima facie case creates a presumption of unlawful discrimination.  See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993).  After plaintiff has established a prima facie case, the burden shifts to defendants to produce evidence that they took the adverse employment action for a legitimate nondiscriminatory reason.  Greene v. Safeway Stores, Inc., 98 F.3d 554, 558 (10th Cir. 1996); Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir. 1995).  Defendants must articulate and produce some evidence that they took each adverse action for a "facially legitimate and nondiscriminatory reason."  Aramburu v. Boeing Co., 112 F.3d 1398, 1403 (10th Cir. 1997).

As explained above, plaintiff maintains that defendants took the following adverse employment actions: (1) reduced her hours to nine hours per week; (2) changed her work schedule to evening and weekend shifts; (3) limited her hours by requiring her to clock out during breaks; and (4) suspended her for refusing to sign a CAAR.[36]  Plaintiff's Memorandum (Doc. #68) at 71.  Defendants have offered

---

[35]    For reasons stated below, the Court finds that even if plaintiff had established a prima facie case on her other retaliation claims, defendants would be entitled to summary judgment on those claims because she has not shown a genuine issue of material fact of pretext with regard to those claims.

[36]    Again, because the Court sustains defendants' motion for summary judgment on plaintiff's allegation of constructive discharge, the Court need not analyze plaintiff's constructive discharge allegation as an additional adverse employment action.

legitimate, non-discriminatory reasons for each of the adverse employment actions.  As to reducing plaintiff's hours and changing her schedule, defendants state that Osco had a budget crisis and management did not believe that plaintiff could run the one-hour photo lab.  As to requiring plaintiff to clock out for breaks, defendants note that Osco had a written policy which required employees to clock out for breaks if they were scheduled for less than three and one half hours in a shift.  As to suspending plaintiff, defendants note that Koch sent plaintiff home because he thought that she would be unproductive after she refused to sign the CAAR.

Because defendants have met their burden of offering non-discriminatory reasons for each adverse employment action, the presumption of discrimination drops from the case and plaintiff must establish by a preponderance of the evidence "that the proffered reason was not the true reason for the employment decision."  Aramburu, 112 F.3d at 1403.  Plaintiff may show pretext by establishing either that a discriminatory reason more likely motivated defendants or that the employer's explanations are unworthy of credence.  Rea v. Martin Marietta Corp., 29 F.3d 1450, 1455 (10th Cir. 1994).

A plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence."  Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted).  While "[t]his burden is not onerous . . . it is also not empty or perfunctory."  Id. at 1323-24.  A plaintiff typically makes a showing of pretext in one of three ways: (1) with evidence that defendant's stated reason for the adverse employment action was false, i.e. unworthy of belief; (2) with evidence that defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) with evidence that defendant acted contrary to an

unwritten policy or contrary to company practice when making the adverse employment decision affecting plaintiff.  Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000).  More specifically, evidence of pretext may include, but is not limited to, the following: "prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating . . . criteria); and the use of subjective criteria." Simms v. Okla. ex rel. Dept. of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1328 (10th Cir.), cert. denied, 528 U.S. 815 (1999).

Plaintiff does not argue that the stated reason for each adverse action is a pretext for retaliation. Instead, she argues that in general, she can establish 14 different incidents of pretext.  See Plaintiff's Memorandum (Doc. #68) at 80-83.  Highly summarized, plaintiff's allegations of pretext include:

(1)     The CAAR on May 5, 2004 was based on an incident two weeks earlier and was never brought to plaintiff's attention.  Koch sent plaintiff home because she refused to sign the CAAR even though Osco had no formal policy which instructed managers to send employees home if they refused to sign a CAAR.  Furthermore, plaintiff was not sent home when she refused to sign a CAAR in October of 2002.

(2)     The CAAR on May 5, 2004 references a CAAR on March 18, 2004 even though plaintiff did not receive a CAAR on March 18, 2004.

(3)     Five hours before plaintiff received the CAAR on May 5, 2004, Peterson asked Bauer about plaintiff's complaints.

(4)     Four days before plaintiff received the CAAR on May 5, 2004, plaintiff received a review which stated "does not meet requirements."  This review was plaintiff's first one even though Osco policy requires at least one review annually.

(5)     Osco managers were under strict instructions to document plaintiff's file and frequently documented issues well after the fact.

(6)     Shilhanek documented plaintiff's file with one incident 15 days after the fact.

(7)     Shilhanek referred to plaintiff as "delusional" even though he had not previously called an employee such a name in a business communication.

(8)     Osco managers instructed plaintiff's co-workers to document plaintiff's file.

(9)     Koch never sent Bauer plaintiff's return-to-work certificate which stated that she could work 32 hours per week.

(10)     Osco limited plaintiff's schedule to nine hours despite the fact that she was cleared to work 32 hours per week.

(11)     On March 15, 2004, Shilhanek did not return plaintiff to her prior work duties but met her at the door and instructed her to clean the entire store.

(12)     Osco accused plaintiff of falsifying her return-to-work certificate in December of 2003.

(13)     In June or July of 2003, Shilhanek threatened to fire plaintiff if she filed a worker's compensation claim.

(14)     Osco submitted sham affidavits from Koch and Dallito.

Id.

The first four allegations of pretext relate solely to plaintiff's suspension for refusing to sign the CAAR.  The remaining ten appear to relate to all of the alleged adverse employment actions.

A.     Change To Evening And Weekend Shifts And Reduction In Hours

Because defendants offer the same reasons for the first two adverse employment actions, the Court analyzes whether plaintiff has shown a genuine issue of material fact of pretext for either the change in her schedule to evening and weekend shifts or the reduction in her hours.  Defendants maintain that in both respects, they changed plaintiff's schedule because of budgetary concerns and plaintiff's inability to run the photo lab.  Plaintiff's claimed incidents of pretext do not tend to show that these reasons are false or that a retaliatory reason more likely motivated the changes to her schedule.  The fact that managers documented

plaintiff's file after the fact on several occasions (allegations 5 and 6) and that Shilhanek referred to plaintiff

as "delusional" after she returned to work in March of 2004 (allegation 7) do not suggest that the stated

reasons for the scheduling decision by Henry and Koch are unworthy of credence.  Plaintiff argues that

Koch never sent Bauer her return-to-work certificate and that Osco limited her to nine hours per week

despite the fact that she was cleared to work 32 hours per week (allegations 9 and 10).  Plaintiff did not

give her return-to-work certificate to Osco, however, until *after* it had reduced her hours.  Moreover,

plaintiff does not dispute that store management ultimately had discretion to determine her schedule based

on store needs and available shifts.  When plaintiff returned to work on March 17, 2004, Osco only had

evening and weekend shifts available, and Osco had so informed plaintiff on December 12, 2003.

Plaintiff complains that when she returned to work on March 17, 2004, Shilhanek did not return

her to her prior work duties but told her to clean the store (allegation 11).  Plaintiff acknowledges, however,

that her duties as a clerk (a position that she had held since January of 2003) included cleaning and odds

and ends.  Accordingly, Shilhanek's instruction to clean the store does not suggest that the stated reasons

for the scheduling decisions of Koch and Henry are unworthy of credence.  Plaintiff next complains that

Osco accused her of falsifying her return-to-work certificate in December of 2003 (allegation 12).  The

undisputed evidence, however, is that in December of 2003 and in March of 2004, Osco management had

concerns about budgetary issues and plaintiff's ability to run the photo lab,[37] and that the only open shifts

---

[37]     In her declaration, plaintiff states that she was qualified to operate the photo lab equipment.
Her assessment of her own qualifications is insufficient, by itself, to show that Shilhanek's perception that
plaintiff could not operate the photo lab in an "efficient or competent manner" is a pretext for retaliation.
Declaration Of Damon Shilhanek ¶ 6, Exhibit D to Defendants' Memorandum (Doc. #64).  Shilhanek had
attempted to train plaintiff in the photo lab in January of 2003.  According to Shilhanek, plaintiff did not
understand how to use the photo machine and would just throw up her hands and say "I can't do this."
Id.; see Shilhanek Depo. at 185.

were on evenings and weekends.  Nothing in plaintiff's cited evidence suggests that Osco management did

not honestly entertain these beliefs or that the stated reasons for their actions are a pretext for discrimination

or retaliation.

Next, plaintiff states that in June or July of 2003, Shilhanek threatened to fire plaintiff if she filed a

worker's compensation claim (allegation 13).  Shilhanek did ask plaintiff two or three times if she really

wanted to file a worker's compensation claim and told her that if she did so, she would regret it.

Shilhanek's statement is some evidence of potential pretext as to plaintiff's worker's compensation

retaliation claim.  A reasonable jury, however, would not find that defendants retaliated against plaintiff for

filing a worker's compensation claim by changing her schedule five months later.  For remarks to be

sufficiently probative of discriminatory intent, plaintiff must demonstrate a nexus between the alleged

discriminatory statements and defendant's adverse decision.   See Rea, 29 F.3d at 1457; see also

McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1129 (10th Cir. 1998) (to rely on allegedly

discriminatory statements, plaintiff must show that decision maker made statements and nexus between

statements and employer's decision); Cone v. Longmont United Hosp. Ass'n, 14 F.3d 526, 531 (10th Cir.

1994) (isolated comments, unrelated to challenged action, insufficient to show discriminatory animus).

Plaintiff has not demonstrated such a nexus.  Shilhanek's statement is best viewed as a "stray remark" that

is not probative of defendants' intent in scheduling plaintiff's hours.  See id.  Plaintiff has not provided

information as to the context of Shilhanek's statement so that a reasonable jury could make some broader

inference as to the scheduling decision some five months later.  See Rea, 29 F.3d at 1457 (no inference

of discrimination permissible from decisionmaker's statement that "he has so many protected people he

couldn't really do his job" where plaintiff failed to provide context of statement and statement could just

as easily be interpreted as evidence that supervisor, although grudgingly, sought to comply with anti-discrimination laws); Cone, 14 F.3d at 531 (no inference of age discrimination permissible from decisionmaker's statement that "long-term employees have a diminishing return" where plaintiff failed to provide context of statement).  More specifically, plaintiff fails to explain when the statements were made or what topic was being discussed at the time. See Rea, 29 F.3d at 1457.  Absent information as to the context of Shilhanek's statement, no reasonable jury could conclude, based solely on the statement, that plaintiff's filing of a worker's compensation claim was a motivating factor in defendants' decision to offer plaintiff only night and weekend shifts and to decrease her hours to nine hours per week.

Finally, plaintiff maintains that Osco submitted sham affidavits from Koch and Dallito (allegation 14).  For reasons explained above, the Court finds that the affidavits are not an attempt to create a sham issue of fact.  See supra notes 11 & 13.   In sum, the Court sustains defendants' motion for summary judgment on plaintiff's claims that defendants changed plaintiff's schedule to evening and weekend shifts and reduced her schedule to nine hours per week in retaliation for her worker's compensation claim, her EEOC complaint, the exercise of her rights under the ADA, FMLA, Title VII and Section 1981.

B.     Requiring Plaintiff To Clock Out For Breaks

Osco maintains that it required plaintiff to clock out for breaks because of written policy which required all employees who worked less than three and one half hours per day to clock out during breaks. Again, none of plaintiff's claimed incidents of pretext tend to show that Osco's stated reason is false or that a retaliatory reason more likely motivated it.  The Court therefore sustains defendants' motion for summary judgment on plaintiff's claims that defendants retaliated against plaintiff by requiring her to clock out during breaks.

C.    Suspension For Plaintiff's Refusal To Sign CAAR

Plaintiff claims that defendants suspended her for two days (the remainder of her shift on May 5, 2004 and her entire shift on May 6, 2004) after she refused to sign a CAAR.  Osco maintains that Koch sent plaintiff home because he thought that she would be unproductive after she refused to sign the CAAR on May 5, 2004.  Viewing the evidence in the light most favorable to plaintiff, a reasonable jury could find that defendants' proffered reason is unworthy of credence.  First, Koch suspended plaintiff approximately six weeks after he and other Osco managers learned of her complaints of race discrimination, approximately four weeks after she had last made a request for accommodation under the ADA and some eight weeks after the settlement of her worker's compensation claim.  In addition, while Koch testified that Shilhanek told him to send plaintiff home if she refused to sign the CAAR, Shilhanek denies that he made this statement.  Finally, the decision to suspend plaintiff for refusing to sign the CAAR was contrary to Osco's past practice when plaintiff refused to sign a CAAR and Osco had no written policy which required that an employee sign a CAAR.  See Kendrick, 220 F.3d at 1230 (pretext may be established if defendant acted contrary to company practice).  For these reasons, a reasonable jury could find that defendants' stated reason for suspending plaintiff is unworthy of credence.

The Court therefore overrules defendants' motion for summary judgment on plaintiff's claims that (1) Osco suspended her for two days in retaliation for her internal complaints of race discrimination, her request for accommodation under the ADA and the filing and settlement of her worker's compensation claim and (2) Shilhanek suspended her for two days in retaliation for her internal complaints of race discrimination.

## IV.    ADA Claim

Plaintiff alleges that because of her disability, Osco (1) reduced her hours to nine hours per week; (2) changed her work schedule to evening and weekend shifts; (3) limited her hours by requiring her to clock out during breaks; and (4) suspended her for refusing to sign a CAAR.  See Pretrial Order (Doc. #67) at 7, 9-10.  Plaintiff also alleges that Osco did not provide a reasonable accommodation for her glaucoma.  Osco argues that it is entitled to summary judgment on both claims because plaintiff is not a qualified individual with a disability.  As to plaintiff's disparate treatment claim, Osco argues that it did not discriminate against plaintiff because of her disability.  As to plaintiff's reasonable accommodation claim, Osco argues that plaintiff did not request an accommodation.

### A.    Qualified Individual With A Disability

Under the ADA, plaintiff bears the initial burden of establishing a prima facie case of discrimination. To do so, plaintiff must show that (1) she is disabled within the meaning of the ADA; (2) she was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) she was discriminated against because of her disability.  Butler v. City of Prairie Vill., Kan., 172 F.3d 736, 747-48 (10th Cir. 1999).

Osco argues that plaintiff is not "disabled" within the meaning of the ADA.  Plaintiff argues that her glaucoma substantially limits the major life activity of seeing.  Under the ADA, a "disability" is "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2); Rakity v. Dillon Cos. Inc., 302 F.3d 1152, 1158 (10th Cir. 2002).  A major life activity is a "basic activity that the average person in the general population can perform with little or no

difficulty." Id. (quoting Pack v. Kmart Corp., 166 F.3d 1300, 1305 (10th Cir.), cert. denied, 528 U.S. 811 (1999)).   Major life activities include functions such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, sleeping, sitting, standing, lifting, reaching, and working." Rakity, 302 F.3d at 1158 (quoting Doyal v. Okla. Heart, Inc., 213 F.3d 492, 495-96 (10th Cir. 2000)).   Plaintiff bears the burden of demonstrating that she has an impairment that substantially limits a major life activity.   See Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 195 (2002).   In determining whether an individual is substantially limited in a major life activity, the Court considers three factors: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent long term impact, or expected permanent or long term impact of or resulting from the impairment.   Id. at 196 (citing 29 C.F.R. § 1630.2(j)(2)(i)-(iii)).   To be substantially limited in performing manual tasks the impairment's impact must be permanent or long term. Id. at 198.

In this case, plaintiff has offered little evidence for the Court to determine whether she is "substantially limited" in the major life activity of seeing, i.e. whether she is "[s]ignificantly restricted as to the condition, manner or duration" under which she can perform the major life activity of seeing "as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity."   29 C.F.R. § 1630.2 (j)(1).   Plaintiff states that her glaucoma causes blurred vision, the inability to see small things and headaches, and that these symptoms are worse at night.[38]   Plaintiff, however, has not offered evidence of the frequency and severity of these symptoms. Plaintiff's diagnosis of glaucoma by itself is insufficient.   See Toyota, 534 U.S. at 198, 199 (existence of

---

[38]      Plaintiff has not submitted any medical records to substantiate her alleged disability.   In her deposition, plaintiff states that her glaucoma causes blurred vision, headaches and the inability to see small things.   Osco does not dispute that plaintiff's glaucoma causes these limitations.   The Court therefore accepts plaintiff's statement of limitations as true.

substantial limitation on major life activity requires case-by-case assessment); Albertson's v. Kirkingburg,

527 U.S. 555, 566-67 (1999) (same); Bancale v. Cox Lumber Co., 1998 WL 469863, at *5 (M.D. Fla.

May 18, 1998) (proffer of diagnoses and labels insufficient to show how visual impairments affect plaintiff's

activities of daily life), aff'd, 170 F.3d 188 (11th Cir. 1999).  The fact that plaintiff's glaucoma may limit

her driving at night also is insufficient to show a substantial limitation on the activity of seeing.[39]  Plaintiff may

have required additional time to drive at night, but it appears that she was able to drive for her two evening

shifts each week between March 17 and May 8, 2004.  Plaintiff's impairment allowed her to work

40 hours per week from November 5, 2001 through mid-January of 2003.  From mid-January of 2003

through July 13, 2003, plaintiff worked between 28 and 32 hours per week as a clerk.  When plaintiff

returned to work on March 17, 2004, she worked two evening shifts and did not have any specific difficulty

related to her disability other than one incident when she placed security tags on trial size bottles of

Listerine.[40]  In sum, plaintiff has shown limited restrictions on her work and other daily activities.  No

reasonable jury could find that plaintiff was "disabled" under the ADA because of her limited visual

impairment.[41]  Because plaintiff has not demonstrated that she suffered a disability under the ADA, Osco

---

[39]     The Court notes that a limitation on driving by itself is insufficient to show that plaintiff is
disabled under the ADA.  See Moreno v. Am. Ingredients Co., No. 99-2119-GTV, 2000 WL 527808,
at *3 (D. Kan. Apr. 7, 2000) (driving not major life activity); Colwell v. Suffolk County Police Dep't, 158
F.3d 635, 643 (2d Cir. 1998), cert. denied, 526 U.S. 1018 (1999); see also Acevedo Lopez v. Police
Dep't of Commonwealth of P.R., 81 F. Supp.2d 293, 297 (D.P.R. 1999) (driving not sufficiently significant
or essential function to qualify as major life activity), aff'd on other grounds, 247 F.3d 26 (1st Cir. 2001).

[40]     Plaintiff asserts that her glaucoma contributed to this labeling error because of her inability
to see small things.

[41]     See Bancale, 1998 WL 469863, at *3 (plaintiff ordinarily not disabled under ADA where
she suffers some form of visual impairment yet is able to perform most daily activities without much
difficulty), aff'd, 170 F.3d 188 (11th Cir. 1999); Still v. Freeport-McMoran, Inc., 120 F.3d 50, 52 (5th
(continued...)

is entitled to summary judgment on plaintiff's ADA claims of disability discrimination and failure to accommodate.

        B.     <u>Evidence Of Discrimination Because Of Plaintiff's Disability</u>

        Plaintiff alleges that her disability based on glaucoma, her perceived disability or her record of disability was a motivating factor as to each of the alleged adverse employment actions.  Osco argues that it is entitled to summary judgment because plaintiff cannot establish a causal connection between her disability and any alleged adverse employment actions.  The Court agrees.  As to Osco's decisions to schedule her evening and weekend shifts, to reduce her hours to nine hours per week and to require her to clock out during breaks, plaintiff has not shown how these decisions are linked to her alleged disability.  As to Osco's decision to suspend plaintiff for refusing to sign the CAAR, plaintiff has not shown a causal connection to her alleged disability under the ADA.  Osco knew that glaucoma affected plaintiff's ability to drive at night, but it did not have notice of any other limitations such as the inability to see small things.

---

[41](...continued)
Cir. 1997) (no disability where plaintiff blind in one eye yet could drive and perform normal daily activities, and was certified marksman); <u>Chandler v. City of Dallas</u>, 2 F.3d 1385, 1390 (5th Cir. 1993) (vision that can be corrected to 20/200 not handicap and plaintiff's vision did not substantially limit major life activity), <u>cert. denied</u>, 511 U.S. 1011 (1994); <u>Monell v. Ks. Ass'n of Sch. Bds.</u>, 2001 WL 487766, at *5-6 (D. Kan. Apr. 18, 2001) (although plaintiff's impairment restricted ability to drive at night, double vision did not substantially limit any major life activity, including ability to see); <u>Cline v. Fort Howard Corp.</u>, 963 F. Supp. 1075, 1080-81 (E.D. Okla. 1997) (nearsightedness and difficulties with peripheral vision not disability under ADA where plaintiff could otherwise drive, participate in recreational activities and perform all other tasks associated with employment); <u>Overturf v. Penn Ventilator, Co., Inc.</u>, 929 F. Supp. 895, 897 (E.D. Pa. 1996) (tumor behind one eye which caused double and sometimes triple vision, and resulted in loss of peripheral vision, not disability under ADA where plaintiff could drive, watch television and read); <u>Walker v. Aberdeen-Monroe County Hosp.</u>, 838 F. Supp. 285 (N.D. Miss. 1993) (although plaintiff had cataracts in both eyes and 20/30 corrected vision, no disability under ADA where work was marginally affected, he remained active in sports, and driving was prohibited only during times when condition worsened).

The Court therefore sustains defendants' motion for summary judgment on plaintiff's ADA discrimination claims for this alternative reason.

      C.     Request For Reasonable Accommodation

      Osco argues that it is also entitled to summary judgment on plaintiff's ADA discrimination claim because plaintiff did not request an accommodation. Plaintiff argues that she requested the accommodation of working during the day because her glaucoma made it difficult for her to drive at night. In its reply, Osco does not dispute that requesting day shifts was a request for a reasonable accommodation. The Court therefore overrules defendants' motion for summary judgment on this alternative ground.

**V.**      **FMLA Claim**

      Plaintiff alleges that Osco and Shilhanek violated the FMLA by (1) denying her request for FMLA leave some time between April and July of 2003 and failing to notify her of her FMLA rights;[42] (2) failing to notify her, during her leave or within two days after her return from leave, that her absences starting on November 27, 2003 were counting as FMLA leave; and (3) failing to return her to an equivalent position following her return from FMLA leave in March of 2004. See Pretrial Order (Doc. #67) at 7, 11-12.

_____

[42]      In the pretrial order, defendants set forth plaintiff's allegation as two separate claims: one for inadequate notice under the FMLA and one for interference with the exercise of plaintiff's FMLA rights. See Pretrial Order (Doc. #67) at 16. In plaintiff's brief in opposition to defendants' motion for summary judgment, plaintiff appears to rely solely on a claim for interference with the exercise of her FMLA rights. See Plaintiff's Memorandum (Doc. #68) at 85. To the extent that the pretrial order sets forth an independent claim for inadequate notice, the Court sustains defendants' motion for summary judgment on that claim for reasons set forth in defendants' memorandum. In particular, plaintiff cannot maintain an independent claim for lack of notice where she has not shown that the lack of notice affected her exercise or attempt to exercise her FMLA rights. In addition, the record establishes that plaintiff already knew her FMLA rights.

A.      Refusal To Place Plaintiff On Leave In Spring Of 2003

Plaintiff alleges that between April and July of 2003, defendants interfered with the exercise of FMLA rights when Shilhanek unilaterally denied her request for FMLA leave because of her sore feet without notifying plaintiff of her FMLA rights.  Under the FMLA, it is unlawful for an employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise" any right provided in the FMLA  29 U.S.C. § 2615(a)(1).  The FMLA does not define "interference," but Department of Labor ("DOL") regulations provide that interference with the exercise of an employee's rights includes not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.  29 C.F.R. § 825.220(b).  If an employer provides a strong disincentive against an employee taking FMLA leave, it violates Section 2615(a)(1) of the FMLA.  See Mardis v. Cent. Nat'l Bank & Trust of Enid, 173 F.3d 864, 1999 WL 218903, at *2 (10th Cir. Apr. 15, 1999); McKinzie v. Sprint/United Mgmt. Co., No. 03-2348-GTV, 2004 WL 2634444, at *9 (D. Kan. Nov. 16, 2004).

To trigger an employer's obligations under the FMLA, an employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed.  29 C.F.R. § 825.302(c).  After an employee provides verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave and the anticipated timing and duration of the leave, the employer should "inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought by the employee, and obtain the necessary details of the leave to be taken."  Id.  In the case of medical conditions, the employer may find it necessary to inquire further to determine if the leave is because of a serious health condition and may request medical certification to support the need for such leave.  Id.  DOL regulations provide that any violation of the regulations constitutes interfering with,

restraining, or denying the exercise of rights provided by the FMLA.  29 C.F.R. § 825.220(b); see Goodwin-Haulmark v. Menninger Clinic, Inc., 76 F. Supp.2d 1235, 1241 (D. Kan. 1999).  To make out a prima facie claim of FMLA interference, plaintiff must establish that (1) she was entitled to FMLA leave; (2) defendants took some adverse action which interfered with her right to take FMLA leave; and (3) defendants' action was related to the exercise or attempted exercise of her FMLA rights.  See Jones v. Denver Pub. Schs., 427 F.3d 1315, 1319 (10th Cir. 2005); Bones v. Honeywell Int'l, Inc., 366 F.3d 869, 877 (10th Cir. 2004).

In their reply brief, defendants address the first element of plaintiff's prima facie case – plaintiff's entitlement to FMLA leave.  Specifically, defendants argue that (1) in the spring of 2003, plaintiff was not an eligible employee under the FMLA and (2) even if she was eligible, plaintiff has not shown that Shilhanek's denial of her oral request prejudiced her ability to receive FMLA leave.  Both arguments appear well taken, but defendants did not assert them in their original memorandum in support of their motion for summary judgment.  The Court will not consider new arguments in a party's reply brief.  See Thurston v. Page, 931 F .Supp. 765, 768 (D. Kan. 1996); Glad v. Thomas County Nat'l Bank, No. 87-1299-C, 1990 WL 171068, at *2 (D. Kan. Oct. 10, 1990); see also Mike v. Dymon, Inc., No. 95-2405-EEO, 1996 WL 427761, at *2 (D. Kan. July 25, 1996) (in fairness, court generally summarily denies or excludes all arguments and issues first raised in reply briefs).  Therefore, although the Court overrules defendants' motion for summary judgment on plaintiff's FMLA interference claim for reasons stated below, the Court directs plaintiff to show cause in writing on or before **January 13, 2006** why the Court should not grant summary judgment in favor of Osco on plaintiff's FMLA interference claim for the reasons stated in defendants' reply.

Liberally construing defendants' memorandum in support of their motion for summary judgment, defendants argue that plaintiffs cannot satisfy the second element of an FMLA interference claim, i.e. plaintiff cannot show that defendants interfered with her right to take FMLA leave.  Plaintiff, however, has presented sufficient evidence to create a genuine issue of material fact on this issue.  Plaintiff states that between April and July of 2003, Shilhanek orally denied her request for FMLA leave.  If true, Shilhanek's conduct is sufficient for a reasonable jury to find that defendants interfered with plaintiff's FMLA rights. See 29 U.S.C. § 2615(a)(1); Mardis, 1999 WL 218903, at *2 (employer threatened to take accrued sick leave and annual leave as condition of FMLA leave); Goodwin-Haulmark, 76 F. Supp.2d at 1242 (employee forced to choose between resignation and working without FMLA leave).  The Court therefore overrules defendants' motion for summary judgment on this ground.

Defendants also argue that they are entitled to summary judgment because plaintiff already knew her FMLA rights.  Defendants have presented evidence that plaintiff knew generally about her FMLA rights and that the Osco employee handbook and a poster in the employee break room also notified her of her rights.  Plaintiff has not responded to this argument, but defendants' argument appears to relate more to an independent claim for lack of notice.  Plaintiff, however, has not specifically asserted such a claim.  See supra note 43.  The fact that plaintiff knew of her FMLA rights does not suggest that defendants did not interfere with plaintiff's attempt to take FMLA leave in the spring of 2003.  The Court therefore overrules defendants' motion for summary judgment on this alternative ground.

B.     Failing To Notify Plaintiff That Her Absences After November 27, 2003 Counted Toward FMLA Leave

Plaintiff alleges that Osco violated 29 C.F.R. § 825.208(e)(1) when it failed to timely designate as FMLA leave her absence from November 27, 2003 through February 26, 2004.  FMLA regulations

require an employer to inform employees when an absence will be treated as FMLA leave. See Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 87 (2002). The regulations require that the notice be in writing and must occur "within a reasonable time after notice of the need for leave is given by the employee - within one or two business days if feasible." Id. (quoting 29 C.F.R. § 825.301(c). The remedy for violation of the FMLA notice regulations is that the leave taken does not count against an employee's FMLA entitlement. See 29 C.F.R. § 825.700(a). In Ragsdale, the Supreme Court struck down Section 825.700(a) as a "categorical penalty" that was incompatible with the FMLA's comprehensive remedial mechanism." Id. at 88-89. Ragsdale held that Section 825.700(a) "is invalid because it alters the FMLA's cause of action in a fundamental way: It relieves employees of the burden of proving any real impairment of their rights and resulting prejudice." Id. at 90. Ragsdale noted that to determine whether damages or equitable relief are appropriate under the FMLA, the fact finder must ask "what steps the employee would have taken had circumstances been different -- considering, for example, when the employee would have returned to work after taking leave." Id. at 91. The employer is liable only for compensation and benefits lost "by reason of the violation," 29 U.S.C. § 2617(a)(1)(A)(i)(I), for other monetary losses sustained "as a direct result of the violation," 29 U.S.C. § 2617(a)(1)(A)(i)(II), and for "appropriate" equitable relief, including employment, reinstatement, and promotion, 29 U.S.C. § 2617(a)(1)(B). The remedy is tailored to the harm suffered. Ragsdale, 535 U.S. at 89. The Supreme Court expressly declined to decide "whether the notice and designation requirements are themselves valid or whether other means of enforcing them might be consistent with the statute." Id. at 96. Ragsdale left open the possibility that employees could recover for notice violations on a case-by-case basis upon a

showing of actual harm resulting from the violations.  <u>Smith v. Blue Dot Servs. Co.</u>, 283 F. Supp.2d 1200,

1205 (D. Kan. 2003) (citations omitted).

Defendant argues that plaintiff cannot maintain a claim based on the late designation of FMLA leave

because she did not suffer prejudice from the late designation.  Plaintiff maintains that the late designation

prejudiced her because – had she known that FMLA leave was accruing – she would have tried to go back

to work immediately after that leave expired, to exercise her right to return to an equivalent position.[43]  <u>See</u>

<u>Plaintiff's Memorandum</u> (Doc. #68) at 87-88.  Plaintiff insists that she suffered prejudice because if she had

returned on February 27, 2004, at the conclusion of FMLA leave, she would have been entitled to an

equivalent position with equivalent hours.  <u>See</u> 29 U.S.C. § 2614(a)(1) (employee who returns from

FMLA leave entitled to equivalent position with equivalent pay).  As it was, plaintiff lost those rights

because she returned on March 17, 2004, three weeks after her FMLA leave expired.  Plaintiff has not

shown that the late designation of FMLA leave prejudiced her.  First, plaintiff has presented no evidence

that she was able and willing to work 32 hours per week beginning February 27, 2004.  In fact, plaintiff

testified to the contrary.  Plaintiff testified that even though she received a return-to-work certificate from

Dr. Gamble for 32 hours a week effective February 27, she did not actually return to work until March 17

because of medical reasons.  <u>See</u> Plaintiff's Depo. at 162-63.  In particular, "[she] still needed a little bit

of work done on [her] shoulder."  <u>Id.</u>  Plaintiff therefore cannot show prejudice on account of Osco's

failure to earlier designate her absence as FMLA leave.  <u>See</u> <u>Hill v. Steven Motors, Inc.</u>, 228 F. Supp.2d

1247, 1258 (D. Kan. 2002) (although plaintiff now claims that she would have tried to return to work

---

[43]     Plaintiff has not shown prejudice because of the designation itself.  Absent a designation
of FMLA leave, because plaintiff had not asked to have any period of absence designated as FMLA leave,
plaintiff would have had no FMLA rights to return to an equivalent position with equivalent pay.

earlier, medical evidence is that she was physically restricted and unable to work during entire period of FMLA leave).

Second, FMLA regulations provide that an employer may retroactively designate an employee's absence as FMLA leave within two days after the employee returns to work.  See 29 C.F.R. § 825.208(e)(1); Plaintiff's Memorandum (Doc. #68) at 85, 89.  Plaintiff did not return to work until March 17, 2004.  Even if defendant had advised plaintiff on March 19 (two days after her return to work) that her leave through February 26 had been designated as FMLA leave, plaintiff would be left in the same position, i.e. no FMLA right to an equivalent position with equivalent pay because she did not return on February 27, 2004.  Likewise, if defendant had advised plaintiff on February 29 (two days after she was eligible to return to work at her previous number of hours) that her leave through February 26 had been designated as FMLA leave, plaintiff would be left without a FMLA right to an equivalent position with equivalent pay because she did not return on February 27.

Finally, the Court notes that the ordinary remedy for violation of the FMLA notice regulations is that the leave taken does not count against an employee's FMLA entitlement.  See 29 C.F.R. § 825.700(a).  Ragsdale struck down that regulation because it assumed that the employee had been prejudiced.  In this case, even the categorical penalty provided in 29 C.F.R. § 825.700(a) is meaningless because plaintiff did not seek additional FMLA leave after March 17, 2004.  Indeed, plaintiff sought to work more hours after she returned to work in March of 2004.  For these reasons, the Court sustains defendants' motion for summary judgment on plaintiff's claim that Osco violated the FMLA when it failed to timely designate as FMLA leave her absence from November 27, 2003 through February 26, 2004.[44]

---

[44]     Defendants have not raised the issue, but it appears that plaintiff was not eligible for FMLA
(continued...)

C.      Failing To Return Plaintiff To Equivalent Position In March of 2004

Plaintiff alleges that Osco violated the FMLA when it failed to return her to her previous position with equivalent hours when she returned from FMLA leave on March 17, 2004.  Upon return from FMLA leave, an employee is entitled to be "restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment."  See 29 U.S.C. § 2614(a)(1)(B).  Osco argues that it was not required to return plaintiff to her previous position at 32 hours per week because as of March 17, 2004, plaintiff was not returning from FMLA leave.  The Court agrees.  Under the FMLA, an employee is protected only if she reports for work with the required certification when her FMLA leave concludes. See 29 C.F.R. § 825.311(c) (if employee fails to provide employer certification of ability to resume work or new medical certification for serious health condition when FMLA leave concludes, employee may be

---

[44](...continued)
leave as of November 27, 2003 because she did not work the required number of hours for the preceding 12-month period, i.e. from November 27, 2002 through November 26, 2003.  To qualify as an eligible employee under the FMLA, an individual must be employed for at least 12 months and provide the employer with at least 1,250 hours of service during the previous 12 month period.  See 29 U.S.C. § 2611(2)(A).  Time spent on leave, paid or unpaid, does not count towards the required hours of service, nor does paid vacation, personal or sick leave or holiday time.  See Family and Medical Leave Act, 60 Fed. Reg. 2180, 2186 (1995) ("Hours worked" does not include time paid but not "worked" such as paid vacation, personal leave, sick leave and holidays, nor does it include unpaid leave of any kind or periods of layoff; whether hours are compensated or uncompensated is not determinative); Wells v. Wal-Mart Stores, Inc., 219 F. Supp.2d 1197, 1207-08 (D. Kan. 2002); Caruthers v. Proctor & Gamble Mfg. Co., 961 F. Supp. 1484, 1490 (D. Kan. 1997).

As a scan coordinator (the position which plaintiff held until January 19, 2003), plaintiff worked 40 to 42 hours per week for a total of 320 to 336 hours during the period from November 27, 2002 through January 19, 2003.  See Plaintiff's Depo. at 48-49.  From February 9 through June 28, 2003, plaintiff worked 27.1 hours a week or a total of 541.9 hours.  See Exhibit H to Defendants' Memorandum (Doc. #64).  Viewing the evidence in a light most favorable to plaintiff, from January 19 through February 8, 2003 and from June 29 through July 13, 2003 (the date plaintiff's disability began), plaintiff worked 32 hours a week or a total of 160 hours.  Plaintiff was off work from July 13 through November 26, 2003. In sum, the record reflects that plaintiff worked at most 1,037.9 hours during the period from November 27, 2002 through November 26, 2003.  Accordingly, it appears that she was not eligible for FMLA leave as of November 27, 2003.

terminated); see also Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 161-2 (2d Cir. 1999) (plaintiff's right to reinstatement could not have been impeded or affected by lack of notice because plaintiff's inability to work continued some two months after leave period ended); Hanson v. Sports Auth., 256 F. Supp.2d 927, 936 (W.D. Wis. 2003); Farina v. Compuware Corp., 256 F. Supp.2d 1033, 1054 (D. Ariz. 2003) (plaintiff who took longer than 12-week leave not entitled to equivalent position unless she was prepared to return to work during time designated as FMLA leave); Summers v. Middleton & Reutlinger, 214 F. Supp.2d 751, 757-58 (W.D. Ky. 2002) (since plaintiff not able to return to work at end of 12 weeks, no prejudice from retroactive designation of FMLA leave). As explained above, plaintiff's FMLA leave expired on February 26, 2004, some three weeks before she returned to work on March 17, 2004. Plaintiff acknowledged that because of medical reasons she did not return to work before March 17, 2004. Accordingly, Osco was not required to return plaintiff to an equivalent position with equivalent hours when she returned to work on March 17, 2004. The Court therefore sustains defendants' motion for summary judgment on this claim.[45]

IT IS THEREFORE ORDERED that Defendants' Motion For Summary Judgment (Doc. #63) filed September 2, 2005 be and hereby is SUSTAINED in part. The Court sustains defendants' motion for summary judgment on all of plaintiff's claims except the following ones which remain for trial: (1) plaintiff's claim that Osco suspended her for two days in retaliation for her internal complaints of race

_____

[45]     In addition, plaintiff has not shown that when her FMLA leave began, she held a position for 28 to 32 hours per week. The FMLA requires restoration "to the position of employment held by the employee *when the leave commenced*." 29 U.S.C. § 2614(a)(1)(A) (emphasis added). When plaintiff's FMLA leave began on November 28, 2003, plaintiff held a clerk position with no set number of hours per week and she was restricted to two to four hours daily. Shortly thereafter, Osco told plaintiff that only evening and weekend shifts were available when she returned to work. Because Osco did not raise this argument, however, the Court does not rely on it as a separate ground for granting summary judgment.

discrimination, her request for accommodation under the ADA and the filing and settlement of her worker's compensation claim; (2) plaintiff's claim that Shilhanek suspended her for two days in retaliation for her internal complaints of race discrimination; and (3) plaintiff's claim that between April and July of 2003, Osco interfered with the exercise of her rights under the FMLA when Shilhanek unilaterally denied her request for FMLA leave because of her sore feet without notifying plaintiff of her FMLA rights.

**IT IS FURTHER ORDERED** that on or before **January 13, 2006**, plaintiff shall show cause why the Court should not grant summary judgment in favor of Osco on plaintiff's FMLA interference claim because (1) in the spring of 2003, plaintiff was not an eligible employee under the FMLA and (2) even if she was eligible, plaintiff has not shown that Shilhanek's denial of her oral request prejudiced her ability to receive FMLA leave.

Dated this 11th day of January, 2006, at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge